We have two argued cases today, but before we get to the arguments, we have a motion from Judge Taranto. I want to move the admission of Stephen Michael Siegel, who is a member of the Bar and is in good standing with the highest court of Maryland. He is also currently my law clerk, and I will attest to what a fine lawyer, advisor, scholar, colleague he has been. And I welcome him to the Bar and know that everybody who will deal with him throughout his career will be honored to do so. I think we'll grant the motion. And I've heard from my own law clerks the same things about you that Judge Taranto mentioned. I haven't had the privilege of working with you personally, but I'm delighted to have you as a member of the Bar of this court. And the motion to admit is granted, and you may take the oath. I take the right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the Bar of the United States Court of Appeals for the Federal Circuit. All right. That brings us to our first argued case, which is number 141634, Prometheus Laboratories versus Roxanne Laboratories, Inc. Mr. Katyal. Thank you, Judge Dike, and may it please the court.  What is the test here? This seems to me to be kind of a genus-species situation in which the 800 patent patented the genus. Also, it was used in treatment of a broad class before the priority date here. We have various cases involving geni or genuses, whatever it is, of chemical compounds, of ranges. We have AbbVie, which dealt with a situation similar to this. Do you agree that we're dealing with a genus-species situation? We do. We think that is one of the key mistakes that the district court made, a legal error in this case, disregarding essentially the teaching of your opinion for the court in AbbVie, because what AbbVie says is that it is very clear that just because a genus is patented doesn't mean that a species of that genus isn't also patentable and non-obvious. Well, that's one of the few things that everybody would seem to agree on, that it's not an automatic invalidation. But the question is, what is the test for non-obviousness in that context? I mean, the way I would read AbbVie is that you've got to show that there's an inability to envision the smaller species and also that there are unexpected results. And, you know, you've got petering in these other cases. It seems to be a bit of a different test than you ordinarily have in the obviousness context. We agree that that is the test in AbbVie and that that should be applied here. We don't think that's what the district court said, by the way. The district court, we think, didn't anticipate AbbVie and instead said that subset claims essentially aren't patentable. But if we took the AbbVie test, which is essentially, you know, could we envisage this claim, we think it's different than an AbbVie in which it was just literally sicker patients or not sicker patients. Here the question is not sicker versus non-sicker. The innovation in the 770 patent is four different limitations. The first is it excluded IBS-C, that is IBS constipated patients. The second is it limited it to women. The third is that it limited treatment to only those who had symptoms of six months. And the fourth is that it limited it to those to moderate abdominal pain or more. Now the question then is either could you anticipate that? Was that something that was understood at the time? And did this yield unexpected results? And here, Judge Dyke, we think the PTO is very clear. This is a joint appendix, page 674. Once these limitations were introduced, there were unexpected results that happened. The cost-benefit, the risk-benefit ratio changed unexpectedly and markedly. That may be true with respect to women. If we can just put that aside for a moment. The other three criteria here, you're using it to treat diarrhea as opposed to constipation, the six-month time frame, and the moderate pain. Those limitations don't show unexpected results, do they? Well, they do, Judge Dyke. And this is joint appendix, page 674. This is what the PTO found. Quote, the evidence now of record shows that selecting a patient population of women suffering from IBS-D for at least six months increases the benefit-risk ratio for elistatron. The popular demand of patients for elistatron showed the invention meets a need that was long felt in the art. Unexpectedly favorable results have been obtained. And so it's not just one thing. It's all. And we think that's one of the other legal errors that the district court made in this case by not thinking through that these limitations all work together and asking the KSR question, which is what would a reasonable person in the art have done, taken all of the different studies at the time, would they have been motivated to combine them in this way? The best evidence to show that the district court was wrong about its conclusion is what happened in 2000 because the drug was introduced without these four restrictions, and we have massive side effects, horrible deaths ensuing, and it took the innovation of the 770 patents issued in 2001 to bring the drug back on the market in 2002. That's the innovation. There was some testimony, I think from Dr. Howden, that there is a disparity between the claim requirements of the 770 and the indications, the full set of indications in the label upon the introduction. How do we know that the markedly more beneficial benefit cost or benefit-risk ratio is attributable to your claims as opposed to the additional items in the list of indications? I'd say two things, one on the facts and one on the law. On the law, we think the district court got it flatly wrong by thinking that for commercial success or the reintroduction of the drug that the patent had to be the sole cause of the success. This court's decision in the Colichem and other decisions is very clear that as long as it's a contributing factor, that alone is enough. We think that was reversible error. And second, on the facts of your question, Judge Taranto, we do think that the 770 patent for all practical purposes is incorporated into the REMS. That's what the district court found in the Markman hearing at Joint Appendix, page 400, clear as day that the reintroduction of the drug followed the contours of the 770 patent. And if you just look at the label and you look at the 770 patent, you see the same thing. So the 770 patent, which is at Joint Appendix, page 71, excludes IBSC, that is IBS-consummated patients, and it excludes men. The label, which is at Joint Appendix, page 888, does the same thing. The six-months language is really very similar. The label says that it is for IBSC patients, quote, generally lasting six months or longer. That's at Joint Appendix, 888. What about the ones that I think that Dr. Howden focused on, what I think in his testimony he described as in the black box and I think was referring to, what's it, 789 in Joint Appendix, DTX-123? I take it the black box is this thing there. And there are other indications there about if you, physicians should instruct patients to immediately report constipation or symptoms of one thing or another. Aren't those meaningful distinctions? Look, our claim is not at all that the patent alone allowed the drug, that that is solely responsible for the commercial success. But their burden is to show by clear and convincing evidence that this wasn't a contributing cause to the drug being reintroduced. Can I change subject? This is a question I perhaps should ask the other side, but I want your take on it first. In the red brief at page 17, the other side says, at the bottom of the page, patients having all of the characteristics identified in the claimed method were treated with elocitron before October 1997. There's no citation there. Is that true, supported by the evidence? If it is, why is there not an anticipation? I'm trying to understand what to make of this declaration. I'm not sure whether there's any evidence in the record of whether that's true or not. But I certainly think even if it were true that that happened, that that wouldn't bear on the question here, which is whether or not there was some innovation that by selecting this patient population, this subset, you narrowed the risk-benefit ratio substantially to the point where, for the first time in its history, to our knowledge, the FDA allowed reintroduction of this drug. Suppose it were true that there were patients, women, six months, moderate pain, predominantly diarrhea, who were in fact being given this drug beforehand. Nevertheless, you think that this can be non-obvious to say, give this drug to women only, the diarrhea-predominant ones, and then the other conditions, which don't come for whatever the significance or non-significance would be, with only kinds of limitations. I do, and I think that follows straightforwardly from Judge Dyke's opinion in Abbey on the unexpected results prompt. So what you're saying is that you're agreeing that there was a genus that included this species in the prior art, and you're saying that nonetheless, the species is patentable over the prior art. That is correct. There's a very large genus in the 800 patent. The 800 patent is found at Joint Appendix pages 775 to 800. It is tens of thousands of words long. It includes using elocitron, not just for IBS, which is mentioned in literally just those three words, but things like anxiety, schizophrenia, substance abuse, flatulence, nausea, a hundred different ailments. And our point is that it was the innovation of the 770 patent by limiting the subset to this group of people that allowed the drug to be brought back on the market. What you're saying, the unexpected results was the ability to bring it back on the market? Is that essentially what you're saying? I think it's a good way of trying to understand what would a POSA here, a person, a gastroenterologist in 1997, would have thought. Would they have thought it would be obvious to have these four limitations? We think both the 2000 introduction of the drug, without those limitations, as well as the... I'm not sure that's the test. I would have thought that the test would be whether there were unexpected results, that it was a dual test that said you have to be able to say that you couldn't envision the species. You've got a problem with that because I think that there's a fairly obvious to look at the earlier group being treated and single out the women. But put aside that for a moment. But turn to the unexpected results, that you'd have to show that there were unexpected results from imposing these limitations. I guess what you're saying is the unexpected results here are the ability to get this approved. When the broader treatment regimen was disapproved. We're not saying it was the ability to get it approved, Judge Duggan. What we're saying is that that's one barometer to show unexpected results. Probably the best barometer, those with the PTO itself found, and they have to disprove that. The barometer of the benefit-risk factor is being quite different. Exactly. That's the underlying fact and the FDA approval is the evidence of that. That is the underlying evidence of what? Of the unexpected result. Exactly. And that's what the PTO found. And we think that shows on the first part of your question, which is it was obvious to anticipate this. No, not at all, Judge. Envision. Envision this. To envision this. We think not at all. And we think once you go through the district court's prior studies, it's just like this court's decision on cyclobenzaprine. It doesn't actually hold up what they're saying. So the district court's cobbling together not one or two things, but 15 different studies to try and say, for example, the IBSC limitation was anticipated. And there's really very little support for that. Really, the district court has two baskets of studies. One is a basket of studies about 5-HT3 receptor antagonists in general. That's a large class. The district court's preferred study on this tally, it's 1 times 5852, says there's at least nine of these, including cocaine. I don't think that says anything about the effect of this particular receptor antagonist, and that's indeed what tally itself says. Can I ask you about this? What difference does it make whether one reads the claim, in particular with its reference to a female population, as having or not having implicitly the kind of excluding men, the way there is this excluding the constipation predominant? Why would it make any difference if it said excluding men as opposed to, we've identified a subclass for whom we know that the benefit-risk calculus is really good. We don't know about the rest of the world. Meanwhile, do these. We think we would win either way, Judge Toronto. That is, it's common ground between all of us that it excludes IBSC patients. That alone is enough of an innovation. It's a huge innovation in allowing the drug to be safe and effective. Even whether it says men or women, we don't think that alone is enough of an innovation. With respect to the exclusion, we think the district court is absolutely right. It joined Appendix page 404 when it said, this patent, by limiting it to women, means to exclude women. Now, whether or not you could read it one way or the other, we think doesn't matter. At the end of the day, it's still a limitation. It's still an innovation in the patent. Beforehand, in 2000, the drug was prescribed to men and women under that 800 broad genus patent, and it took the innovation of the 770 patent to say, no, that's a mistake. Limit it to this subset of people. That's what allows the risk-benefit ratio to be at its best. And if you look at, for example, the 2000 label, when the drug was introduced, it said that it could be used for constipated patients. It's joined Appendix 876. It said you can manage that constipation through things like laxatives and so on. The innovation of this patent is to say, no, you have to blanketly exclude these people, because if you give it to them, that risk-benefit ratio doesn't work. That's the innovation. That's what, when you're asking, was that something that would have been envisioned in 1997 by a POSA judge, the answer is no. The best evidence of that is it didn't happen three years later in 2000. Rather, the drug was introduced wholesale to everyone, and indeed when it was yanked off the market, it was also blanketly withdrawn. It wasn't left on the market with these four limitations. We think that's a pretty good test, pretty good evidence to indicate that that was something that wasn't envisioned at the time. Okay. Well, you're out of time. We'll give you two minutes for rebuttal. Okay. Mr. Dinger? May it please the Court? We agree that this case presents fundamentally a genus-species issue, and we agree with the test as set forth in ADVI, but I think it is clear that that test has not been satisfied. It is trivial to imagine the subset, the IBS patients that are diarrhea-predominant, that are women, and that have suffered moderately severe pain and symptoms for at least six months. Those constituted the bulk of IBS patients in the prior arc. It is also, there is nothing... I understand that the bulk of the patients are women. Do you have any numbers on which are more IBSD-predominant versus IBSC-predominant? Nothing specific. My understanding is that IBSD is more predominant. But, you know, certainly there's... Can I ask you this question, which I asked Mr. Katyal? You say on page 17, patients having all of the characteristics, not each one separately, but all together, identified in the claim method, were treated with elocitron before October 1997. There were two studies in the record, the Foster study and the Bardham study. They are found at... Foster is at 868 of the appendix, and Bardham is at 866 of the appendix. We should have cited those, and I apologize for not. There were clinical studies done on elocitron, obviously before the FDA. Before the priority date. And those all included... And testimony. And did those all establish that there were six months' worth of symptoms? I didn't think so. I believe so. Okay. The testimony... I mean, the record sites that I gave you just, Ronald, are the testimony of Roxanne's witnesses, and the testimony was that these studies did include, would have included, persons with at least six months of symptoms. But there wasn't... Was there any evidence of unexpected results? Put aside the female population. Unexpected results of limiting it to these other three. That is, limiting it to the diarrhea patients, the moderate pain, and the six months of symptoms. I mean, first of all, it's our position that the patent doesn't limit it to those patients, that the only exclusion in the patent is the exclusion for IBSC, the constipation patients. Indeed, Prometheus... I understand that, but let's assume their argument that it is limited to those... Is there anything in the record about unexpected results with respect to those three criteria? There is nothing unexpected about Elocitron treating any member of that subclass. The prior Art 800 patent taught that Elocitron would treat the symptoms of IBS. But I take it, and it almost has to be the case in this context, that the results that we're interested in here are a comparison of benefits and risks. So, is it not unexpected, as indicated by what happened to the drug in 2000, that without some narrowing of the patient pool, the benefit-risk calculus was a very unfortunate one? The benefit-risk calculus... I mean, this patent did nothing to solve the problem of these side effects. The incidence of side effects... How is it that the FDA allowed this back on the market with a set of indications that, if not identical, is awfully close to what's claimed here? Well, there's no evidence in the record why the FDA took the action it did, but it is at least as plausible, if not more plausible, that the reason the FDA approved it was precisely the black box directions. What are the elements of that that are different from the claim requirements? It requires specific instructions and education, both to physicians and to patients. On what? On the severe side effects. I mean, what was critical,  resulted in a diminishment of the severity of side effects. Not the incidence. Nobody knows what causes these things, and they have occurred at the same rate as they did before the product was withdrawn. But if they're less severe, that changes the benefit-risk. But the district judge's finding was, and there are articles that explain this, the reduction in the severity resulted from doctors being more alert to the risks and monitoring their patients. I mean, there's a paper in the record which identifies that as the reason why the severity, not the incidence, but the severity of these adverse events has diminished. And those precautions, those monitoring precautions, the education precautions, are in the label, but they are not in the patent. Could we back up a moment so I could better understand how this product came back on the market and what the FDA process is for that? I mean, it was taken off the market because people died because there were adverse effects. How does it work with the FDA that the thing comes back on the market? I think the proponent requested the FDA approve it under a new label. And there was some process of negotiation with the FDA over the label, and it included indications. The only contraindication in the label, by the way, is IBSC patients. I mean, as far as the patent is concerned, there's nothing in the label that says, don't give it to men. There's nothing in the label that says, don't give it to people who haven't had six months of symptoms or who have not had at least moderate pain. I mean, Prometheus is one of the principal expert witnesses, the gastroenterologist, and she testifies that she does prescribe Olocetron for male patients suffering from IBSD. Can I ask you the same question which I asked Mr. Cattell? I'm a little bit puzzled about this. Suppose somebody has a drug, and they haven't defined the patient pool, and without defining the patient pool, very bad idea, this drug. Then they say, okay, we've got some subclass of potential patients. For them, we've just established this is a good benefit-risk calculus. We don't know about the rest of the world now. We'll do that later, but for now, I will claim a method of giving this drug to the patient pool subclass that we know presents a good benefit-risk calculus. I'm not excluding the rest, but we don't know. Is that not a significant advance? I'm not sure it is a significant advance. Suddenly the drug can be made available in the market, whereas before it couldn't. I'm not sure what this whole limitation business is, what function it's playing in the analysis. Again, I go back to the point, the only limitation is IBSD. The others are not limitations. They are assessment stages, and they are not... Can I ask you this? I know you have a lot of prior art for why the IBSD limitation was already known. Assuming none of that was there, and people had no idea why this was causing certain people to die or have serious side effects, and the patentee discovered it's because this drug works badly for C patients, but works well for the D patients. Would that be a patentable idea? It depends on how... I think in part on how the claim is... Why isn't that an unexpected result? You create this drug, you say it can be used for this whole universe of things. It wasn't just for IBS, it was indicated for other things, but it turns out that it works very badly for certain people. You do some more research, and you identify here is why it's working badly. Isn't that an unexpected result? There is no evidence that elocitron works badly for anybody, any IBS patients, other than IBS constipation. That's what I'm asking about, though. I think he's asking a hypothetical, that there is a drug on the market, and it has very bad effects on people, and researchers discovered the unexpected fact that this works effectively without side effects for teenagers, and it doesn't work for other categories of people. Is that potentially patentable? If the patent went on, and responsive to Judge Toronto's question, affirmatively excluded them the way this patent does to IBSC patients, then maybe there's an argument, but that's not what these claims do. They do not exclude other than IBSC patients. Would there be in that situation also a requirement of not being able to envision the limitation? Frankly, our cases are not always easy to follow. Just hold on a second. In terms of the chemical genus species, those are cases where the genus includes hundreds of thousands or millions of compounds, and we couldn't envision singling out the one, whereas in this situation, even putting aside unexpected results, there's an ability to envision a subset of patients which is smaller than the whole. Should that make a difference? It seems to under the cases. I think it does. The patient population defined in these claims, women with IBSC with symptoms of certain severity and duration are commonplace. They are typical of many, many IBS patients. It was certainly possible to imagine elocitron as a treatment for them given the prior art. There is nothing unexpected given the teachings of the prior art that elocitron would be effective for that subset. Now, whether you can patent, in addition, you can get a patent based on the idea that there's an unfavorable cost-benefit analysis for other patients where we don't know, I don't think you can get a patent on that. I think that is, you know, give it to women but don't give it to men. That's not functional. This is what I was trying to get at with my hypothetical. I'm not sure I still understand your answer, but it sounds like you're saying you can't patent an exclusion. If you have a drug that is already indicated to treat a certain condition, if it turns out that a certain segment of that population it works badly for and you exclude them, that that's not a patentable idea. I think that's right. How do you infringe a patent which says a method for avoiding illness by not treating persons in a particular category? I don't think that's a method of treatment. This patent claims a method of treating a certain class of patients. Let me just elaborate a little bit on, maybe it's too high a level of concern, but the fact is a drug works in an individual patient or it doesn't. Everything that goes under the heading of now personalized medicine, but even before that heading came to be subclass medicine, has to do with figuring out what human bodies measured in some way will match up well with a particular drug. It really is now not going to be an area of patentable invention to figure out which individuals or subclasses match up well with the drug and say for this drug, these individuals match up. We haven't studied a lot of the others. Put those aside for now. Maybe some others will, but for now, we suddenly have a good match. If it is otherwise patentable, a method for treating a particular class of patients, sure, can be patented. Is that what this is? No, I don't think so, because I think prior art taught the use of this drug to treat a class that included these people. Well, it can be patented, but what's the test for whether it can be patented? Unexpected results. Unexpected results. And what about envisioning? I mean, both. I think both are satisfied here. That's what Judge Nike wrote in the Advy case. It was, you know, if a method of treating a genus makes obvious the method of treating a species, if a person of ordinary skill in the arts has clearly in mind, unlike the many chemical patents, which claim a formula that encompasses millions of compounds. I mean, here we have, it's not a class of molecules. It is a class of patients, of human beings suffering from a disease. And there aren't thousands and thousands of parameters. This patent deals with the most common characteristics that gastroenterologists look at in order to diagnose whether the disease is present at all. And persons of skill in the art understood the mechanism by which this class of drugs worked. It slowed colonic transit. And as the judge found, and there's no claim of clear error, a person of skill in the art would understand that a drug in this category would slow colonic transit, and that's good for diarrhea patients, and it's not good for constipation patients. So that exclusion was obvious. And there are no other exclusions. Why is that exclusion obvious, since it's possible that the adverse effect on the constipation patients might be, while real, sufficiently minor, relative to at least one well-recognized benefit, which is, I guess, the analgesic effect, the pain reduction, that in fact you might not want to exclude those patients even though there was an increase or potential increase in the constipation. The district judge found that the prior art taught persons of ordinary skill in the art that it was imprudent. And many of the prior art references on which the district judge relied discouraged the Talley reference in particular, suggested that administering a 5-HT3 receptor antagonist would be contraindicate, would not be a good idea, but giving it to a diarrhea patient would be a good thing. So there was a finding that, I mean, which is not to say that individual doctors might not disagree, they're free to prescribe off-label, but the finding here, and it's not been challenged, is clearly erroneous, is that a person of ordinary skill in the art in 1997 would conclude that it was appropriate to prescribe Velocitron and other 5-HT3 receptor antagonists to diarrhea patients and not to constipation patients. Thank you. Okay, thank you, Mr. Damien. Mr. Kratel, you've got two minutes now. Thank you. If I could, I'd like to start with Judge Hughes' question to my friend on the other side, which was, would it be patentable if we had an unexpected result for a subset of the population? My friend's answer was yes, as long as the patent affirmatively excluded that population. That's exactly what this patent does. It's common ground with respect to at least IBSC, that that's what it does. That's enough to make it patentable. As I said before, the PTO found unexpected results for this in terms of the risk-benefit ratio being markedly different, and they have to disprove that by clear and convincing evidence. There's a huge impact if you don't allow unexpected results claims like the ones here with respect to the IBSC limitation on personalized medicine and all the things that Judge Taranto is talking about. Well, don't you run into the findings that the district court made here about that they weren't unexpected, right? Right. We do think that you have to review those in the same way this court did in cyclobenzapine for clear and convincing error. We think they are. That is, they fall into two baskets. One is a basket of generic 5-HT3 studies, which don't teach anything about ilosterone, and indeed some of them say that it has no effect on colonic transit like the Stedman case. The other is studies done on healthy volunteers, and the district court's own studies say you can't look to those. So the analysis by the district court essentially swallowed itself. It used different studies to try and cobble this obvious misclaim together, but when you actually look at the studies, they don't add up. It's 0 plus 0 plus 0 plus 0. So I don't think the studies get to where the district court wanted to go. So then I think they're left with what they say at page 17, Judge Taranto, that this population... No, but they also have Dr. Howden's testimony that builds on the studies, which perhaps all by themselves don't have examples of this particular antagonist with this particular patient class. But a lot of stuff pointing in that direction. Why doesn't he add enough? He doesn't explain anywhere in there why the generic class is enough for ilosterone, and indeed he himself says that these antagonists have very different effects. Things like cocaine have different effects. In fact, the district court's preferred study, Stedman, studies on donosterone and finds no effects on colonic transit. But be that as it may, you can fight about the fact is the drug was introduced in this way, blankedly, and all of these devastating effects occurred. And sure, there's maybe 12 people in the Foster study that followed some of the limitations in the 770 patent, which is all the Foster study is. Our point is it was introduced to more people, and it took the innovation of the 770 patent to winnow it down to the right cost-benefit ratio, allowing the drug to be prescribed in a safe and efficacious way, and indeed brought back to the market. But is that winnowing down for safety and efficacy reflected in the 770 patent itself? We do think it is, yes. Well, I mean, in terms of the discussion. Yes, I do. I think that the specifications explain that this is the right population. That is, of course, exactly what the PTO found, that when you have these four limitations and when you take them all together, and I think that was another legal problem that the district court did, is they looked at each limitation in isolation instead of thinking, as KSR did, what would the motivation be to combine? And so Houghton, I don't think, gets them to where they want. At most, it says, yeah, there's a worry about constipation. But we know from 2000 that the FDA said the way to deal with that is by giving laxatives and other things, not to exclude IBS patients entirely. That's what the 770 patent did. That's the innovation. And if you allow this to be declared as obvious, I really do think you're driving a stake into these subset patent claims and agreed that they're not all going to be patentable, which is your decision in that. But when you have something like this with a bunch of different parameters and really no evidence, except for an academic study of 12 people, that says, oh, it was limited in this way, and it turns out that doesn't even say that. It wasn't limited to women and so on. I don't think that you can get to affirming the district court on a 103 claim. Okay. Well, thank you, Mr. Conchel. Thank you. Thank both counsel. The case is submitted.